IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ABBOTT LABORATORIES, an Illinois corporation, and LABORATOIRES FOURNIER S.A., a French corporation,<br><br>        Plaintiffs,<br><br>  v.<br><br>TEVA PHARMACEUTICALS USA, INC., a Delaware corporation,<br><br>        Defendants. | Case No. 1:08-cv-01243 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C.§ 1404(A) IN LIEU OF ANSWERING**

## I.  PRELIMINARY STATEMENT

Plaintiffs Abbott Laboratories ("Abbott") and Laboratoires Fournier S.A. ("Fournier") submit this memorandum of law in opposition to Defendant Teva Pharmaceuticals USA, Inc.'s ("Teva") motion to transfer venue to the District of New Jersey.  Plaintiffs' patent rights are being infringed by Teva who made a voluntary decision to file an Abbreviated New Drug Application (ANDA) seeking regulatory approval to market a generic version of TriCor® 145 mg, Plaintiffs' patent-protected drug product.

Plaintiffs have chosen to litigate this case in the Northern District of Illinois, which is Abbott's home District and a District where all of the parties to this action previously litigated a patent case involving Teva's generic version of an earlier TriCor product.  Teva is now seeking to transfer this action to New Jersey for consolidation with an action involving a different set of patents, relating to different inventions made by different inventors and owned by different

assignees, than the patents in this action. Plaintiffs Abbott and Fournier are not even parties to the New Jersey action and they should not be forced out of Abbott's home District to protect their patent rights.

As described below, there will be little, if any, overlap in addressing the legal and factual issues presented by the patents asserted here and in New Jersey. The patents in this action differ from the patents in the New Jersey action in a variety of important ways that are critical to the ultimate issues of claim construction, infringement, and validity. These important differences include different inventors, different invention stories, different patent specifications, unrelated prosecution histories, different claim terms, different claim scope, different priority dates for prior art purposes, different assignees, and different prosecuting attorneys. The patents are unique and need to be considered in their own context.

To the extent that there is any overlap between this action and the New Jersey action it is minimal. A few common words between the patents does not render the patents related or mean that they have the same scope, and although the same product is at issue in this action and the New Jersey action, any overlap as to the question of infringement is minimal. The patents in the two actions relate to different inventions and will require different evidence. The law recognizes inherent differences in patents and requires infringement and validity analyses to be done on a patent claim by patent claim basis. Thus, there will be no meaningful judicial economy gained by transferring this action to New Jersey. Under these circumstances, Plaintiffs' choice of forum should be respected.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. Case Status

Plaintiffs filed this action asserting three patents against Teva on February 29, 2008. Teva moved to transfer to the District of New Jersey on March 31, 2008. This Court held a hearing regarding Teva's motion on April 2, 2008, requesting that the parties focus their arguments on the issue of judicial efficiencies associated with transfer.

B. TriCor®

This patent litigation was filed pursuant to the regulations of the Hatch-Waxman Act[1] in response to Teva's attempt to obtain FDA approval for a generic version of TriCor. TriCor was introduced in 1998 and has been used to treat millions of patients with cholesterol problems. TriCor is marketed in the United States by Abbott, a resident of this District. Fournier, a French company, is the assignee of the patents-in-suit. TriCor, whose active ingredient is fenofibrate, is currently available in 145 mg and 48 mg dosage strengths. TriCor has been a significant commercial success and has current annual sales of over $1 billion dollars.

The current version of TriCor is based on two sets of independently conceived technologies, and is covered by two sets of independent patents containing different claims to these different technologies. The first technology relates to work done by Drs. Stamm and Seth who developed pharmaceutical formulations with "micronized fenofibrate" (*i.e.*, particles of fenofibrate, the dimensions of which are less than or equal to about 20 microns in size) at their company PharmaPass in France in the mid-1990s. This technology was purchased by Fournier and is embodied in the patents in this litigation.

---

[1] Drug Price Competition and Patent Term Restoration Act ("Hatch-Waxman Act"), codified in pertinent part at 21 U.S.C. § 355 and 35 U.S.C. § 217(e)(2).

The development of the current Tricor 145 mg and 48 mg formulations also involved technology licensed from Elan Pharma International Ltd. ("Elan") by Fournier Laboratories Ireland Ltd. ("FLI"), a company that shares a common patent with, but is separate from, plaintiff Fournier here. In addition to licensing Elan technology, FLI also worked with Elan to develop some jointly owned technology. The technology, which was developed independently of Seth and Stamm, relates to the use of nanotechnology ("nano" refers to one thousandth of a micron) in connection with pharmaceutical product development. This technology is covered by patents at issue in New Jersey.

C.    Teva's Generic Drug Product

TriCor's success has attracted generic drug manufacturers. Teva has released generic versions of the two previous TriCor formulations, and now seeks approval for a generic version of TriCor 145 mg. Patent litigation in connection with Teva's first generic version of TriCor was handled in this District in *Abbott Laboratories et al. v. Novopharm Ltd. et al.*, No. 00-CV-2141-JWD (granting summary judgment of non-infringement to Teva). Patent litigation in connection with Teva's second generic version of TriCor was handled in the District of Delaware in *Abbott Laboratories et al. v. Teva Pharmaceuticals USA, Inc.*, No. 02-CV-1512-SLR. The parties settled the Delaware litigation prior to trial.

In January and February 2008, Abbott, FLI, and Elan received Paragraph IV certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) from Teva stating that Teva had filed an ANDA requesting FDA approval to market a generic version of TriCor 145 mg before the expiration of the eight patents covering TriCor that are listed in the Orange Book.[2] Teva claimed that each of the eight patents was not infringed, invalid, and/or unenforceable.

---

[2] Formally known as the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations.

D.  The Patents and The Actions

As noted above, the technology and patents covering TriCor 145 mg falls into two distinct groups: (1) inventions by Drs. Stamm and Seth and (2) inventions by Elan and FLI.

1)  *The Stamm and Seth Patents*

The three patents at issue in this litigation are U.S. Patent Nos. 6,277,405 ("the '405 patent"); 7,037,529 ("the '529 patent"); and 7,041,319 ("the '319 patent") (collectively, the "Stamm/Seth Patents").[3]  These patents were acquired from Drs. Stamm and Seth and are solely owned by Fournier and licensed by Abbott.  These patents are in the same patent family (*i.e.*, trace lineage back to a common parent patent application).  Each relate to a composition containing "micronized fenofibrate" and having a specified dissolution profile (*e.g.*, speed at which the fenofibrate dissolves when put into a specified medium).

2)  *The Elan Patents*

The three patents at issue in the New Jersey action, where Abbott and Fournier are not parties, are U.S. Patent Nos. 5,145,684 ("the '684 patent"); 7,276,249 ("the '249 patent"); and 7,320,802 ("the '802 patent") (collectively, the "Elan Patents").[4]  The Elan Patents are either owned solely by Elan with licenses to FLI or jointly owned by Elan and FLI.  These patents are not in the same patent family as the Stamm/Seth Patents.  These patents do not have any inventors in common with the Stamm/Seth Patents.  The Elan Patents relate to nanoparticulate formulations with surface stabilizers and other ingredients, bioequivalence requirements, and methods for using such formulations for treating patients with lipid problems.

---

[3] Copies of the Stamm/Seth Patents are found in Exs. 5-7 of Teva's Opening Brief.

[4] Copies of the Elan Patents are found in Exs. 8-10 of Teva's Opening Brief.

149475v1

## III. RELEVANT LAW

Under 28 U.S.C. § 1404(a), transfer is appropriate when "(1) venue was proper in the transferor district, (2) venue and jurisdiction would be proper in the transferee district, and (3) the transfer will serve the convenience of the parties and the witnesses as well as the interests of justice." *First Nat. Bank v. El Camino Resources, Ltd.*, 447 F.Supp.2d 902, 911 (N.D. Ill. 2006)(denying motion to transfer). A transfer should be denied unless the balance of factors is strongly in favor of Teva. *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 664 (7th Cir. 2003)(denying writ of mandamus on district court's denial of transfer motion). Teva "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986)(affirming denial of motion to transfer venue). Teva cannot establish this.

The first two prongs of the analysis are not in dispute as this District and the District of New Jersey are proper venues and have personal jurisdiction over Teva. To determine the third prong, courts consider the interests of justice and the private interests of the parties.

In analyzing the interests of justice, the focus is on judicial economy, the court's familiarity with the applicable law, the speed at which the case will proceed to trial, and the desirability of resolving controversies in their locale. *See Coffey*, 796 F.2d at 221; *First Nat.* at 912.

In analyzing the private interests, a court should consider the plaintiff's choice of forum, situs of the material events, and convenience of the parties and witnesses. *First Nat.* at 911. While not absolute, "a plaintiff's choice of forum is given substantial weight when, as here, it is the plaintiff's home forum." *Id.* at 912.

A review of these factors weighs in favor of denying transfer to New Jersey.

149475v1

## IV. ARGUMENT

### A. The Interests Of Justice Do Not Favor Transfer

#### 1) *Transfer To New Jersey Will Not Meaningfully Increase Judicial Economy*

Teva's motion rests on the flawed premise that this action and the New Jersey action are similar. They are not. The Stamm/Seth Patents and the Elan Patents involve different technologies and are directed to different inventions. Because of these differences, there is no meaningful judicial economy gained by transferring this action to New Jersey.

There are three fundamental issues that a court will need to determine that are unique to each of the patents. First, what is the proper construction of the disputed claim language in each patent? *See e.g., Markman v. Westview Instruments*, 52 F.3d 967, 976 (Fed.Cir. 1995)(requiring courts to determine meaning and scope of the asserted claims), *aff'd* 517 U.S. 370 (1996). Second, using the proper construction, does Teva's proposed product meet the claim limitations of each of the patents either literally or under the doctrine if equivalents? *See id.* Third, are each of the patents valid? *See e.g., Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001)(noting that claim construction needs to be resolved prior to validity determinations).

These inquiries rest on characteristics unique to each of the patents and, in fact, unique to each of the claims within the patents. Indeed, "infringement and validity analyses **must be performed on a claim-by-claim basis**." *Id.* (emphasis added). Factors that go into the analyses include: (a) the scope of the claims in each of the patents, (b) the conception, reduction to practice, and filing date of each of the patents, (c) the specifications of each of the patents, (d) the prior art that exists for each of the patents, and (e) the prosecution history for each of the patents. *See e.g.,* 35 U.S.C. § 102, 103, and 112 (noting some requirements for patent validity);

- 7 -

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (en banc) (affirming importance of

intrinsic record of a patent, including specification and prosecution history, in determining claim

construction). Judicial efficiencies in these various analyses will only result when there are

substantial similarities between the patents (*e.g.*, common inventors, common specifications,

common claim terms, similar priority dates, etc.).

> (i)     The Stamm/Seth Patents Are Very Different From The Elan Patents In a
>         Variety of Important Ways

The Stamm/Seth Patents are very similar to each other, but are very different from the

Elan Patents in a variety of ways.  The Stamm/Seth Patents are members of the same patent

family; each of the patents is a descendant of the same priority patent application.  Each of the

patents has the same inventors, similar invention story, a similar patent specification, related

prosecution histories, overlapping claim terms, similar claim scope, the same priority date for

prior art purposes, the same assignees, and the same expiration date.  Given these similarities, the

claim construction, infringement, and validity/enforceability analyses for the Stamm/Seth patents

will have some overlap and therefore it would be efficient to address those patents in one case.

The same cannot be said for melding the Elan Patents in the same case as the Stamm/Seth

Patents.  As noted above, the Stamm/Seth Patents and the Elan Patents have many important

differences including, different inventors, different invention stories, different patent

specifications, unrelated prosecution histories, different claim terms, different claim scope,

different priority dates for prior art purposes, different assignees, and different prosecuting

attorneys.  Many of these differences are evident in the following table comparing the Elan

Patents and the Stamm/Seth Patents:

149475v1

| Patent No. and Title | Inventors | Priority Date | Assignee | Patent Prosecutors |
|---|---|---|---|---|
| **Stamm/Seth Patents** | | | | |
| 6,277,405 Fenofibrate Pharmaceutical Composition Having High Bioavailability and Method for Preparing It | A. Stamm P. Seth | Jan. 17, 1997 | Fournier | Hale & Door LLP |
| 7,037,529 Fenofibrate Pharmaceutical Composition Having High Bioavailability and Method for Preparing It | A. Stamm P. Seth | Jan. 17, 1997 | Fournier | Venable LLP[5] |
| 7,041,319 Fenofibrate Pharmaceutical Composition Having High Bioavailability | A. Stamm P. Seth | Jan. 17, 1997 | Fournier | Venable LLP |
| **Elan Patents** | | | | |
| 5,145,684 Surface Modified Drug Nanoparticles | G. Liversidge K. Cundy J. Bishop D. Czekai | Jan. 25, 1991 | Elan | A. Rosenstein W. Davis |
| 7,276,249 Nanoparticulate Fibrate Formulations | T. Ryde E. Gustow S. Ruddy R. Jain R. Patel M. Wilkins | May 24, 2002 | Elan and FLI | Foley & Lardner |
| 7,320,802 Methods of Treatment Using Nanoparticulate Fenofibrate Compositions | T. Ryde E. Gustow S. Ruddy R. Jain R. Patel M. Wilkins | May 24, 2002 | Elan and FLI | Foley & Lardner |

This table helps to illustrate the fact that Stamm/Seth Patents and the Elan Patents have different geneses. The inventions were conceived and patented independently and at different times by different groups of inventors.

---

[5] The responsible attorney from Hale & Door moved to Venable during patent prosecution.

149475v1

(ii)    The Claims Of The Stamm/Seth And Elan Patents Are Directed to
Different Inventions Involving Different Claim Elements

A review of the claims from the Stamm/Seth and Elan Patents makes the deep substantive

differences readily apparent.  The only substantive similarity between the Stamm/Seth Patents

and the Elan Patents is that they generally relate to pharmaceutical compositions, but they use

very different claim terms, not surprisingly, because they address different inventions.  For

example, the Stamm/Seth Patents recite such claim limitations as micronized fenofibrate,

granulates, inert carrier particles, admixtures, and hydrophilic polymers.  None of these

limitations are recited in the Elan Patents.

| Example of Stamm/Seth Patent Claim |
| --- |
| ('405 patent, Claim 1)<br><br>A composition comprising a hydrosoluble carrier and micronized fenofibrate having a dissolution of at least 10% in 5 minutes, 20% in 10 minutes, 50% in 20 minutes and 75% in 30 minutes, as measured using the rotating blade method at 75 rpm according to the European Pharmacopoeia, in a dissolution medium constituted by water with 2% by weight polysorbate 80 or with 0.025M sodium lauryl sulfate. |

The Elan Patents recite claim limitations such as particles consisting essentially of 99.9-

10% by weight of a crystalline drug substance, non-crosslinked surface modifiers, D50 particle

sizes, bioequivalency, confidence intervals, redispersion, and biorelevant media.  None of these

claim limitations are recited in the claims of the Stamm/Seth Patents.[6]

---

[6] Teva notes that the Elan Patents has some dependent claims with dissolution profiles.  These claims however, are different in scope (*e.g.*, require different percent dissolved at different times) than the claims of the Stamm/Seth Patents with dissolution profiles.

| **Example of Elan Patent Claim** |
|---|
| ('249 Patent, Claim 1)<br><br>A stable fenofibrate composition for oral administration comprising:<br><br>(a) particles of fenofibrate having a D50 particle size of less than about 500 nm, and<br><br>(b) at least one surface stabilizer, wherein:<br><br>(i) the composition exhibits bioequivalence upon administration to a human subject in a fed state as compared to administration to a human subject in a fasted state; where bioequivalency is established by:<br><br>(a) a 90% Confidence Interval for AUC which is between 80% and 125%, and (b) a 90% Confidence Interval for Cmax, which is between 80% and 125%;<br><br>(ii) the composition redisperses in a biorelevant media; and<br><br>(iii) the composition is phospholipid-free. |

(iii)    There Is No Meaningful Judicial Savings By Having Both The
Stamm/Seth And Elan Patents Before A Single Court

Before even considering the patent specifications and prosecution histories, it is apparent

that the scopes of the Stamm/Seth and Elan Patents are very different. When the intrinsic

records (*e.g.*, specification and prosecution history) of the patents are considered, the differences

between the Stamm/Seth and Elan Patents are magnified. The intrinsic records vary widely in

content between the Stamm/Seth and Elan Patents.

Given these differences, and the fact that the claim construction, infringement, and

validity inquiries are patent and claim specific, there are no meaningful judicial efficiencies to be

gained by putting the Stamm/Seth and Elan Patents in the case before the same judge.

Teva relies largely on the fact that that same accused product is at issue in this action and

the New Jersey action. Of course, the similarity in accused product has nothing to do with the

claim construction or the validity inquiries. *See e.g., Jurgens v. McKasy,* 927 F.2d 1552, 1560

149475v1

(Fed. Cir. 1991) (noting that a "claim is construed **without regard to the accused**

**product**")(emphasis added). Even as to infringement, any overlap is minimal. One must

determine whether the accused products contain all of the elements of the patent claims. The

Stamm/Seth and the Elan Patents relate to different inventions. For example, the Stamm/Seth

Patents require there to be at least one particle of "micronized fenofibrate" in Teva's product. In

contrast, claims of one of the Elan Patents recite a claim limitation of an "effective average

particle size of less than about 400 nm." Thus, proof of infringement will require different

evidence because of the different scale of the claim limitations (microns versus nanometers).

Moreover, the Stamm/Seth Patents require a determination of whether Teva's products

satisfy the claim limitations of "hydrosoluble carrier," "granulates," "hydrophilic polymer," and

"inert carrier particles." Such inquiries are not required for the Elan Patents. Conversely, the

Elan Patent claims refer to a "non-cross linked surface modifier," "D50 particle size of less than

500 nm," the ability to "redisperse in a biorelevant medium," the absence of "phospholipids," and

"bioequivalency" requirements. These are not claim elements of the claims of the Stamm/Seth

Patents.

Because there is no significant overlap in the limitations recited by the claims, there is no

chance of inconsistent factual findings about the nature of Teva's product. The factual inquiry

behind the infringement analysis between the Stamm/Seth and Elan Patents will be markedly

different.

2) *The Remaining Interest Of Justice Factors Do Not Favor Transfer*

The remaining interest of justice factors – the court's familiarity with the applicable law,

the speed at which the case will proceed to trial, and the desirability of resolving controversies in

their locale – do not weigh in favor of transfer to New Jersey.

This Court is experienced in trying patent infringement cases. Also, there is no indication that the New Jersey court would try this case any faster than this Court would. Finally, the desirability of resolving controversies pertaining to residents of this District in this District weighs against transfer.

B. The Public Factors Do Not Favor Transfer

1) *Plaintiffs Choice Of Venue And The Situs Of Events Weighs Against Transfer*

Plaintiffs' choice of venue should be given great deference, particularly when the Plaintiffs reside in the District. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 ("plaintiff's choice of forum should rarely be disturbed"). This Court recently recognized that Abbott's choice of venue of its home district should be given great deference, and denied a defendant's motion to transfer a patent litigation filed by Abbott to New Jersey. *See Abbott Laboratories v. Church & Dwight, Inc.,* No. 07-CV-3428, WL 3120007, at *2 (N.D. Ill. Oct. 23, 2007)("Abbott resides in this district. Therefore, this factor weighs against transfer and the Court must give it substantial weight.")(emphasis added).

Plaintiffs had numerous, principled reasons for choosing this District. In addition to being Abbott's home district, this District is: the place where TriCor enters United States distribution channels, where Abbott prepared its New Drug Application covering TriCor, where Abbott and Fournier have met numerous times over the last decade regarding TriCor, where Abbott will be harmed if Teva launches an infringing generic TriCor 145 mg product, and where Abbott and Fournier and Teva have engaged in litigation involving TriCor in the past. This District has a substantial relationship to this patent infringement action, and has a stronger relationship to these patent claims than New Jersey.

149475v1

2)  *The Convenience of the Parties and Witnesses Does Not Favor Transfer*

By virtue of filing suit in this District, Abbott and Fournier have decided that it is convenient for them to litigate in Chicago.  Over the past decade, Fournier has traveled to Chicago often in connection with Abbott's and Fournier's ongoing relationship concerning TriCor.

Teva is very familiar with litigating in Chicago, including litigating against Abbott and Fournier in an earlier TriCor-related case.  Teva's lead patent counsel for this action (as well as the two previous actions involving TriCor) – Leydig, Voit & Mayer – is based in Chicago.  This District has been convenient for all of the parties in the past, and remains so now.  Transfer to New Jersey would only result in shifting any possible inconvenience to Plaintiffs, which is not allowed. *See Church & Dwight,* No. 07-CV-3428, WL 3120007, at *4 ("Transfer will not be ordered if it would merely shift the burden of inconvenience from one party to the other.").

Plaintiffs will take steps to make sure that Teva's witnesses are not inconvenienced by this case proceeding in Chicago.  As is standard practice in litigation, and has been the norm in the various TriCor patent litigations with Teva, Plaintiffs will depose Teva's witnesses in locations convenient for Teva's witnesses and counsel.  The parties have been able to amicably work out deposition location issues in the past, and Plaintiffs do not expect this case to be any different.   Plaintiffs will also coordinate discovery with the New Jersey litigation to ensure that discovery is not duplicative.

3)  *It Is Fair To Proceed in Illinois and New Jersey*

Teva has voluntarily decided to seek approval for a generic version of TriCor prior to the expiration of the eight patents listed in the Orange Book as protecting the product.  By doing so, Teva opened itself up to the possibility of lawsuits from the various owners and licensees of the patents.

149475v1

The patents at issue in Illinois and New Jersey have different sets of ownership and licensee interests. The various plaintiffs, as independent businesses with various rights and obligations in connection with the patents, have independent ideas as to how and where to proceed with litigation regarding the infringement of their intellectual property. The parties' decisions should be respected, particularly when the judicial interests in having the cases in the same venue is not strong given the stark differences between the patents.

* * *

For the reasons set forth above, the interests of justice and the private factors do not strongly favor transfer. Teva's motion should be denied.

149475v1

GRIPPO & ELDEN LLC

STEPTOE & JOHNSON LLP


__/s/ Laura K. McNally_____     _____/s/ Peter J. Meyer_____

Lynn H. Murray
Laura K. McNally
111 S. Wacker Drive
51st Floor
Chicago, IL 60606
(312) 704-7700

Peter J. Meyer
115 South LaSalle Street
Chicago, Illinois 60603
(312) 577-1300

*ATTORNEY FOR ABBOTT LABORATORIES*

*ATTORNEY FOR
LABORATOIRES FOURNIER S.A.*


OF COUNSEL

OF COUNSEL

William F. Cavanaugh
Chad J. Peterman
PATTERSON, BELKNAP, WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000

Glenn J. Pfadenhauer
Kevin Hardy
Anne Rucker
Kendra Robins
Williams & Connolly LLP
725 Twelfth St., N.W.
Washington, D.C. 20005
(202) 434-5000


Timothy C. Bickham
Roger W. Parkhurst
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

April 22, 2008


- 16 -

<u>**CERTIFICATE OF SERVICE**</u>

I, Laura K. McNally, an attorney, hereby certify that on April 22, 2008, **PLAINTIFFS'
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO
TRANSFER VENUE PURSUANT TO 28 U.S.C.§ 1404(a) IN LIEU OF ANSWERING** was
electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice
of electronic filing to the following:

> Bruce M. Gagala (bgagala@leydig.com)
> M. Daniel Hefner (mdhefner@leydig.com)
> Douglas A. Robinson (drobinson@leydig.com)
> Peter H. Domer (pdomer@leydig.com)
> LEYDIG, VOIT & MAYER, LTD.
> Two Prudential Plaza – Suite 4900
> Chicago, IL 60601
> (312) 616-4600


        /s/ Laura K. McNally